IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Norfolk Division**

| | |
|---|---|
| JOAN ALLISON )<br>724 Bayberry Lane )<br>Norfolk, Virginia 23502 )<br>   )<br>   Plaintiff, )<br>   )<br>   v. )<br>   )<br>NORFOLK ACADEMY )<br>1585 Wesleyan Drive )<br>Norfolk, Virginia 23502 )<br>   )<br>And )<br>   )<br>DENNIS G. MANNING )<br>1585 Wesleyan Drive )<br>Norfolk, Virginia 23502 )<br>   )<br>   Defendants. ) | Case No. _____ |

**COMPLAINT**

Plaintiff Joan Allison, by counsel Thomas Shumaker of the law firm Ernest Law Group, PLC, brings this employment discrimination and retaliation action against her former employer Defendant Norfolk Academy and former supervisor Dennis G. Manning.

**INTRODUCTION**

1.  This is a civil rights action for discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.* ("Title VII"), the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), to correct unlawful employment practices on the basis of race and retaliation to vindicate Ms. Allison's rights and to make her whole. Ms. Allison seeks declaratory and injunctive relief, damages, and attorney's fees and costs.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 42 U.S.C. § 2000e-5(f)(3).

3. This Court has personal jurisdiction over Defendants because each defendant performed the acts and omissions complained of within this District.

4. Pursuant to 28 U.S.C. § 1391(b) and Local Rule 3(c), venue is proper in the Eastern District of Virginia, Norfolk Division because: Plaintiff resides in this District and Division; Defendant Norfolk Academy employed Plaintiff in this District and Division; Defendant Manning resides in this District and Division; and the Defendants' unlawful employment practices alleged herein, which give rise to Plaintiff's claims, occurred in this District and Division.

## ADMINISTRATIVE PROCEEDINGS

5. Ms. Allison filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") encompassing the discriminatory and retaliatory conduct that is the subject of this Complaint.

6. Ms. Allison has received a Notice of Right to Sue from the EEOC within 90 days of filing this Complaint, and she has fulfilled all administrative prerequisites to the prosecution of her claims in this Court. Attached hereto and incorporated herein is Exhibit A.

## THE PARTIES

7. Plaintiff is an adult female resident of the City of Norfolk in the Commonwealth of Virginia.

8. Defendant Norfolk Academy is a non-profit organization doing business in the Commonwealth of Virginia and headquartered at 1585 Wesleyan Drive Norfolk, Virginia 23502.

9. Defendant Dennis G. Manning is an adult male resident of the City of Norfolk in the Commonwealth of Virginia and works at 1585 Wesleyan Drive Norfolk, Virginia 23502.

## STATEMENT OF FACTS

10. Plaintiff is an African American who worked as a third-grade boys teacher at Norfolk Academy from 1997 to 2019.

11. Defendant Norfolk Academy is a private primary and secondary school that hired Allison in 1997.

12. At all times relevant herein, Defendant Norfolk Academy operated a business that was engaged in an industry affecting commerce and employed more than fifteen employees.

13. Defendant Manning was, at all relevant times, the Headmaster of Norfolk Academy, the most senior employee of the Norfolk Academy and, as Headmaster, held a position that was akin to the CEO of a corporation.

14. At all relevant times herein, Allison was the only African American third-grade teacher at Norfolk Academy.

15. At all relevant times herein, less than nine percent of the teachers in the Norfolk Academy "lower school" were African-American.

16. At all relevant times, less than nine percent of the students at the Norfolk Academy are African-American.

17. As a private school, Defendant Norfolk Academy charged tuition to the parents of its students.

18. The parents of Norfolk Academy's students would periodically complain to Defendant Manning or other school administrators when the parents were displeased with how a teacher was treating their child.

19. From 1997 to 2016, parents of Norfolk Academy's students occasionally would complain to Defendant Manning or other school administrators that they were displeased with how Ms. Allison was treating their child.

20. Norfolk Academy had a practice or policy that whenever a parent complained to Manning or other school administrators, the school administrators would share the details of the complaint with the teacher involved so that the teacher could give the administrators information relevant to the complaint and be involved in addressing the parents' concerns.

21. From 1997 to 2016, when parents complained about Ms. Allison, Norfolk Academy would share the details with Allison, would ask her for information relevant to the complaint, and would allow her to be involved in addressing the parents' concerns.

22. From 1997 to 2016, when parents complained about Ms. Allison, Norfolk Academy would not criticize Ms. Allison and would not threaten involuntary reassignment or other adverse action.

23. From at least as early as 2013 and until the end of Allison's employment with Norfolk Academy, the school either engaged in, tolerated or failed to take effective remedial action regarding numerous racially-biased or racially insensitive policies or incidents that occurred at or was committed by Norfolk Academy staff or students ("Racial Incidents.")

24. These Racial Incidents had a negative impact on Ms. Allison and created an unwelcomed and negative environment for Norfolk Academy's African American students, and staff, including Ms. Allison.

25. One of the Racial Incidents occurred in or around February of 2016, when a student posted a picture of several other students in front of a Confederate Flag with a racial slur in the caption.

26. Another Racial Incident occurred while middle school students were reading "To Kill a Mockingbird" and their teacher asked all the black students in the classroom if their parents used the "N" word at home.

27. Another Racial Incident occurred in a 4th grade art class, when a white student told two black classmates, "You'd better watch out, or we'll put the KKK on you."

28. Another Racial Incident occurred when a second grade teacher told the parents of a black second grader that a "S-" (below average) in reading comprehension was a good grade for their child.

29. In-part because of these Racial Incidents, Ms. Allison joined other minority faculty members in June 2016 in a meeting with Headmaster Manning regarding a Summer Meeting for Mastery In Teaching ("SUMMIT") regarding diversity, inclusivity and anti-discrimination issues.

30. In late June of 2016, Headmaster Manning invited those who wanted the school to hold the SUMMIT into his office and shared his decision to not approve the proposed SUMMIT.

31. Allison strongly encouraged Headmaster Manning to reconsider his decision because the Norfolk Academy was allowing or failing to correct an environment that was unwelcomed and negative for Black families, students and staff.

32. Mr. Manning reconsidered and the SUMMIT took place in the summer of 2016.

33. Despite the August 2016 SUMMIT, the Racial Incidents continued at Norfolk Academy.

34. In November 2016, a student publicly tweeted a racist statement on the night of President Obama's election.

35. In February 2017, a student during class made comments implying that slavery was not as bad as history makes it out to be because the slaves were given food and shelter.

36. In-part because these Racial Incidents continued, if not were escalating, Ms. Allison and a concerned parent shared information about racial incidents from the different divisions, which later was used to construct a letter reporting and expressing concerns about the numerous racial incidents at Norfolk Academy that contributed towards an environment that was unwelcomed and negative for Black parents, students and staff.

37. This letter was sent to Mr. Manning on April 7, 2017. The April 7, 2017 letter also contained a number of recommendations that were aimed at making the atmosphere at Norfolk Academy less hostile to Black parents, students, and staff.

38. Because the April 7, 2017 letter referenced multiple incidents that had only occurred with Ms. Allison, Mr. Manning knew, or at least suspected, that Allison played a role in contributing to the letter.

39. In late 2017 or early 2018, Manning purported to receive or learn about some complaints about Allison from 4 or 5 parents ("2017-18 Parent Complaints").

40. Instead of sharing all the details of the 2017-18 Parent Complaints with Ms. Allison, Manning and/or Norfolk Academy administrators showed no evidence of investigating these complaints and never involved Ms. Allison.

41. In contrast, when Manning and other school administrators received a complaint about a similarly-situated non-African-American teacher or about a similar-situated teacher who had not engaged in protected conduct, the Norfolk Academy would share all the details of the complaints with the teacher and allow the teacher to be involved in investigating and attempting to resolve the complaints.

42. In addition to not allowing Allison to assist in resolving the parent complaint, Mr. Manning appeared to make a presumption of guilt on Ms. Allison's part because he refused to

advocate or investigate on her behalf and ominously warned Allison that "something" would have to be done about these complaints.

43. When it came to Allison's ability to enforce standard, school-wide rules in the classroom and to handle students, Manning and other school administrators treated Allison less favorably than similarly-situated non-African-American teachers or less favorably than similar-situated teachers who had not engaged in protected conduct in that Allison was either criticized for enforcing standard rules or in some instances told that she could not use the same corrective measures as other teacher when dealing with common situations, such as: using loss of some recess time as a response to misbehavior and/or repeated missed homework; or not permitting students to reenter the classroom after the end of the school day to collect forgotten items.

44. Despite several requests, Mr. Manning and other administrators refused to observe Ms. Allison's interactions with students and offered no written evaluations with recommendations.

45. One of the 2017-18 Parent Complaints came from a man (hereinafter "Parent #1") whose name is not being listed in this document out of respect for the privacy of the man's minor child (a child who for the purpose of this document will be referred to a ("Student #1").

46. In an April 29, 2018 email, Parent 1 wrote to Manning that he essentially wanted to withdraw his prior parent complaint because he and his wife:

> "realize [Student #1] had been misinterpreting Ms. Allison's words and actions in ways and for reasons that are unclear to us. …That Ms. Allison is genuinely and profoundly concerned for her students' psychological well-being became very clear to us and she made every effort to help [Student #1] deconstruct the misinterpretations that had formed in his mind, and to help him understand communication.  We appreciate her taking the time to not only help [Student #1] through this, but to actually help us as parents to [be] better parent. We have personally thanked Ms. Allison for her Herculean effort and would note that a teacher who motivates/mentors/guides a student to self-actualize is remarkable."

47. Despite receiving the April 29, 2018 email from Parent #1, Manning failed to tell Allison that he received it, in contrast to his actions in quickly informing Allison about purported Complaints. When Allison mentioned the April 29, 2018 email, Manning stated that the incident with Student #1 that led to the later withdrawn complaint "should have never happened."

48. In order to oppose what she found to be repeated incidents where rules or policies were being applied to her in a disparate or discriminatory manner and in order to oppose what she believed was a racially insensitive and hostile environment for students, staff and parents, Allison gave Manning a letter on May 22, 2018, summarizing her concerns and seeking support and solutions for the various prejudicial treatment she and others were experiencing.

49. Allison's May 22, 2018 letter raised a number of examples of how she believed the administration was treating her differently than non-Black teachers or similarly situated teachers who had not engaged in protected conduct.

50. The May 22, 2018 letter included the statement "I wonder why, even after the talk about the racial divide in our country right now, the immediate response was to dismiss the possibility of the role of implicit [racial] bias and/or what I refer to as power dynamics could play…. "

51. That letter stated, in relevant part, "I wonder what it will take for people who don't experience [racial] bias to recognize it and have empathy for those who do."

52. In August of 2018, the Norfolk Academy began its 2018-2019 academic year.

53. After the 2018-2019 academic year began, Ms. Allison's efforts to oppose what she believed was a racially insensitive and hostile environment for students, staff and parents continued. In September of 2018, Ms. Allison sent an email to Manning encouraging him to watch "America to Me", a documentary series that follows a handful of students and teachers at a

suburban Chicago School, as they address and try to improve decades-old racial discrimination and racially-caused educational inequities. Allison also invited Manning to discuss the docuseries with her.

54. Headmaster Manning failed to respond to this email in a timely manner

55. Over a week later, Allison resent the email to Manning because he had failed to acknowledge receipt and again invited him to discuss the docuseries with her.

56. After Allison resent the email, Manning told Allison on October 30, 2018 that accepted her invitation to discuss the docuseries. However, upon Allison's arrival in Manning's office, Manning did not discuss the issues about racial injustice in education that were raised in the docuseries and instead counseled Ms. Allison about his concern of what he referred to as "an alarming, unprecedented number" of parent complaints.

57. During the above referenced meeting that had been scheduled to discuss the issues about racial injustice in education, Ms. Allison attempted to redirect the conversation to discuss how trained specialists working directly with small groups of faculty could provide tools for them to respond to and avoid racial incidents and teach them to analyze their curriculum to make it more equitable and inclusive. Mr. Manning ignored her efforts and avoided any discussion of the topic

58. In March of 2019, Ms. Allison was informed that at the end of the 2018-19 academic year, she would not be allowed to continue classroom teaching and that she would be involuntarily transferred to a different job.

59. In March of 2019, Manning told Allison that she could be transferred to the position of Aftercare Director ("Aftercare Job"), effective the start of the 2019 – 2020 School year.

60. Allison did not want the Aftercare Job because of the reasons listed in paragraphs 63 to 74 below and because the Aftercare Job was essentially babysitting.

61. Mr. Manning then offered Ms. Allison a job that including library duties and social justice research. (hereinafter the "Library/Social Justice Job").

62. Allison did not want the Library/Social Justice Job because of the reasons listed in paragraphs 63 to 74 below.

63. In light of Manning's past history of failing to recognize, admit and correct a racially hostile environment at Norfolk Academy and his history of ignoring evidence that she was doing a good job and believing anyone who criticized her, Allison reasonably believed: she was being involuntarily placed in a job that would have been impossible to perform successfully without Manning's full public and private support; there was little to no chance that Manning would give her fair, nondiscriminatory and/or non retaliatory treatment; and she would be fired in the future.

64. Even though both the Aftercare Job and the Library/Social Justice Job would have required Allison to supervise up to 80 students (up to 4 times more than her job as a teacher), Allison and any reasonable teacher at Norfolk Academy considered both the Aftercare Job and the Library/Social Justice Job a demotion and as a job having significantly less important or challenging duties as those of a third grade teacher within the hierarchy of the Norfolk Academy.

65. Allison and any reasonable teacher at Norfolk Academy considered both the Aftercare Job and the Library/Social Justice Job a significant reduction in title and/or prestige at Norfolk Academy.

66. Allison and any reasonable teacher at Norfolk Academy considered both the Aftercare Job and the Library/Social Justice Job a demotion and a reduction in job responsibilities.

67. Allison and any reasonable teacher at Norfolk Academy considered both the Aftercare Job and the Library/Social Justice Job menial or degrading work change compared to those of a third grade teacher at a prestigious private school.

68. Allison and any reasonable teacher at Norfolk Academy considered involuntary reassignment to either the Aftercare Job or the Library/Social Justice Job a form of harassment or humiliation by the employer calculated to encourage resignation.

69. Allison tried to give the school the opportunity to correct Manning's decision to involuntarily assign her to an intolerable position by attempting to speak with an administrator. But because Norfolk Academy did not have an effective anti-discrimination policy, there was no one designated for Allison to complain to about allegations that Manning was discriminating or retaliating against her. Accordingly, the administrator told Allison that all faculty grievances are handled by Mr. Manning alone.

70. Allison also attempted to speak with a board of trustees member who similarly said faculty grievances are handled by Mr. Manning alone.

71. On account of the facts above, Allison reasonably believed that the involuntary reassignment was intolerable because she had faced and likely would continue to face a continuing pattern of discriminatory and retaliatory treatment: that interfered with her ability to effectively teach; that demeaned her reputation in the eyes of the parents and her peers; that included undeserving criticism based on complaint investigations that excluded her input; and that ignored positive (and in at least one instance even glowing) remarks from parents.

72. Allison also reasonably believed that the involuntary reassignment was intolerable because Manning: had demonstrated hostility towards Allison's efforts to prevent racial harassment; was unable or unwilling to understand that the environment and culture at Norfolk

Academy was based on conscious or subconscious racial bias and was hostile to African-American students and staff; and had discriminated and retaliated against her.

73. Allison also reasonably believed that the involuntary reassignment was intolerable because the Norfolk Academy did not have an effective policy, practice or mechanism to investigate race discrimination or retaliation complaints against Manning.

74. In June of 2019 -- after suffering for more than two years in an environment where Racial Incidents were not properly addressed, after watching Mr. Manning's repeated indifference towards an environment that was unwelcomed and negative for African American students and staff, after being subjected to two years of discriminatory and retaliatory behaviors, after having key policies or practices applied to her in a discriminatory manner, after being presumed guilty whatever a student complained to their parents and the parent repeated the complaint to Norfolk Academy, after both her concerns about the racially hostile environment and her suggestions on how to correct that environment were not addressed, and after no one was willing to investigate her complaints that Manning was discriminating and/or retaliating against her, Ms. Allison believed she was being set up for failure—Ms. Allison believed that Mr. Manning would continue to harass and retaliate against her, that Mr. Manning would ensure she would not be successful in the Aftercare or Library/Social Justice Jobs, that she was being set up to be fired, and that she had no real choice but to resign her employment.

75. Ms. Allison resigned from Norfolk Academy in June of 2019.

## COUNT I
## Race Discrimination v. Norfolk Academy in Violation of Title VII

76. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

77. Norfolk Academy's involuntary reassignment to an undesirable position constituted discrimination on account of race because, among other reasons, no non-African-American teacher was involuntary reassignment to such an undesirable position between at least 2010 and 2019.

78. As a result of Norfolk Academy's involuntary reassignment to an undesirable position, Plaintiff has suffered non-monetary damages, such as emotional distress, inconvenience, humiliation, and other indignities, as well as attorneys' fees and costs.

79. As such, Ms. Allison is entitled to equitable as well as monetary relief from Norfolk Academy for its violation of Title VII.

## COUNT II
### Race Discrimination v. all Defendants in violation of Section 1981

80. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

81. At all times material to this Complaint, Ms. Allison and Defendants were parties to employment agreements under which Ms. Allison provided services to Defendants and Defendants were required to, among other things, compensate Ms. Allison for her services.

82. Ms. Allison performed her employment-related obligations.

83. Defendants actions have discriminated against Plaintiff on account of her race by, among other things, treating her less favorably that similarly-situated non-African American co-workers.

84. Defendants' above-pled discrimination has deprived Allison from enjoying the terms and conditions of her employment and constitutes unlawful race discrimination in violation of Section 1981.

85. As a result of Defendants' actions, Plaintiff has suffered non-monetary damages, such as emotional distress, inconvenience, humiliation, and other indignities and is entitled to equitable as well as monetary relief from Defendants for their violation of Section 1981.

## COUNT III
### Retaliation v. Norfolk Academy in Violation of Title VII

86. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

87. Plaintiff engaged in protected activity by reporting the race-based discrimination and harassment to which she and others were subjected by Defendants.

88. Norfolk Academy's involuntary reassignment to an undesirable position because she engaged in protected activity constitute unlawful intentional retaliation in violation of Title VII because, among other reasons, no similar situated teacher who had not engaged in protected activity was involuntary reassignment to such an undesirable position.

89. As a result, Plaintiff has suffered non-monetary damages, such as emotional distress, inconvenience, humiliation, and other indignities, as well as attorneys' fees and costs.

## COUNT IV
### Retaliation v. All Defendants in Violation of Section 1981

90. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

91. Defendants' involuntary reassignment to an undesirable position were committed with reckless disregard for Ms. Allison's right to be free from discriminatory treatment on account of her protected activity and were in violation of Section 1981.

92. As a result, Plaintiff has suffered non-monetary damages, such as emotional distress, inconvenience, humiliation, and other indignities, as well as attorneys' fees and costs.

93. Accordingly, Plaintiff is entitled to the equitable and monetary relief set forth in the following prayer for relief for Defendants' violation of her rights under Section 1981.

## COUNT V
### Hostile Work Environment v. Norfolk Academy in Violation of Title VII

94. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

95. As detailed above, Plaintiff was subjected to a severe and pervasive race-based and retaliation-based harassment.

96. The above actions constitute violations of Title VII.

97. Plaintiff has suffered non-monetary damages, as well as attorneys' fees and costs.

98. Accordingly, Plaintiff is entitled to the equitable and monetary relief set forth in the following prayer for relief for Defendants' violation of her rights under Title VII.

## COUNT VI
### Hostile Work Environment v. All Defendants in Violation of Section 1981

99. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

100. As detailed above, Plaintiff was subjected to a severe and pervasive race-based and retaliation-based harassment.

101. The above actions constitute violations of Section 1981.

102. Accordingly, Plaintiff is entitled to the equitable and monetary relief set forth in the following prayer for relief for Defendants' violation of her rights under Section 1981.

## COUNT VII
### Constructive Discharge v. Norfolk Academy in Violation of Title VII

103. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

104. As detailed above, Norfolk Academy involuntarily reassigned Plaintiff to a job that was intolerable and, based upon the totality of the circumstances, Plaintiff had no reasonable choice but to resign.

105. Norfolk Academy constructively discharged Plaintiff in violation of Title VII.

106. As a result of Norfolk Academy's actions, Plaintiff has suffered monetary and non-monetary damages, such as emotional distress, inconvenience, humiliation, and other indignities and is entitled to equitable as well as monetary relief from Defendants for their violation of Title VII.

107. Ms. Allison is entitled to equitable as well as monetary relief from Norfolk Academy for its violation of Title VII.

## COUNT VIII
### Constructive Discharge v. All Defendants in Violation of Section 1981

108. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

109. As detailed above, Norfolk Academy involuntarily reassigned Plaintiff to a job that was intolerable and, based upon the totality of the circumstances, Plaintiff had no reasonable choice but to resign.

110. Defendants constructively discharged Plaintiff in violation of Section 1981.

111. As a result of Defendants' actions, Plaintiff has suffered monetary and non-monetary damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants and asks that this Court grant the following relief:

A. A permanent injunction enjoining Defendant Norfolk Academy from continuing to maintain its illegal policy, practice or custom of discrimination/harassing/ retaliating against employees and ordering it to promulgate an effective policy against such unlawful acts and to adhere thereto:

B. Defendant Norfolk Academy is to compensate Plaintiff, reimburse Plaintiff and make Plaintiff whole for emotional distress or other non-monetary/compensatory damages she suffered and make Plaintiff whole for any and all pay and benefits she would have received had it not been for Norfolk Academy's illegal actions, including but not limited to past lost earnings, future lost earnings, and medical and other benefits.

C. Defendant Manning is to compensate Plaintiff, reimburse Plaintiff and make Plaintiff whole for emotional distress or other non-monetary damages she suffered and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Norfolk Academy's illegal actions, including but not limited to past lost earnings, future lost earnings, and medical and other benefits.

D. In the event a jury finds one or more Defendants' actions were intentional or otherwise warrant punitive damages, than an amount to be determined by the jury appropriate to punish Defendants and deter Defendants or others from engaging is such misconduct in the future;

E. Attorneys' fees and costs in this matter;

F. Post-judgment interest at the highest applicable legal or statutory rate; and

G. Such other further relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues raised herein and so triable.

Date:   December 7, 2020                    Respectfully Submitted

/s/ *Thomas Shumaker*
Thomas A. Shumaker II (Va. Bar No. 72039)
ERNEST LAW GROUP, PLC
505 South Independence Boulevard, Suite 103
Virginia Beach, Virginia 23452
Phone: (757) 289-2499
Fax: (757) 277-0265
tshumaker@ernestlawgroup.net

*Attorney for Plaintiff*